UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DAVID J. COTA, CDCR #C-26012,

                Plaintiff,

v.

L.E. SCRIBNER, et al.,

                Defendants.

Case No. 09cv2507-BEN (BLM)

**REPORT AND RECOMMENDATION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

[ECF No. 20]

This Report and Recommendation is submitted to United States District Judge Roger T. Benitez pursuant to 28 U.S.C. § 636(b) and Local Civil Rules 72.1(c) and 72.3(f) of the United States District Court for the Southern District of California.

On November 6, 2009, Plaintiff David J. Cota, a state prisoner proceeding *pro se* and *in forma pauperis*, filed this civil rights suit against the warden at Calipatria State Prison, L.E. Scribner, and five officers, R. Bishop, J. Crabtree,[1] E. Duarte, G. Stratton,[2] and M. Tamayo under 42 U.S.C. § 1983. ECF No. 1 ("Compl."). Plaintiff contends that Defendants conspired to, and did, revalidate him as a gang associate and on that basis, assigned him to an indeterminate term in the Security Housing Unit ("SHU"). Compl. at 1-15. Plaintiff asserts claims under the

---

[1] Because the Complaint provides no first initial for Defendant Crabtree, the Court will use the initial from Defendants' Motion to Dismiss. See ECF No. 20-1 at 9.

[2] The Complaint variously identifies this defendant as "Stranton," "Stanton," and "Stratton." For consistency, the Court will refer to him as "Stratton," the spelling used by Defendants.

1   First Amendment, Eighth Amendment, and Fourteenth Amendment, as well as separate
2   conspiracy claims.  Id. at 16-32.  Plaintiff seeks a declaratory judgment, preliminary and
3   permanent injunctive relief, expungement of erroneous information from his file, release from
4   the SHU, and compensatory and punitive damages.  Id. at 33-35.  Defendants filed a motion to
5   dismiss on March 5, 2010, contending that: (1) Plaintiff failed to exhaust administrative remedies
6   against Defendants Scribner, Stratton, and Tamayo,[3] and (2) Plaintiff failed to state a claim
7   against any Defendant upon which relief can be granted.  ECF No. 20-1 ("Defs.' Mem.").  Plaintiff
8   opposed the motion on May 28, 2010.  ECF No. 34 ("Opp'n").  Defendants did not file a reply.

9        The Court has considered the Complaint, Defendants' Motion to Dismiss, Plaintiff's
10   Opposition, and all supporting documents submitted by the parties.  For the reasons set forth
11   below, this Court **RECOMMENDS** that Defendants' Motion to Dismiss be **GRANTED IN PART**
12   **AND DENIED IN PART**.

13                              **FACTUAL BACKGROUND**

14        Because this case comes before the Court on a motion to dismiss, the Court must accept
15   as true all material allegations in the Complaint, and must construe the Complaint and all
16   reasonable inferences drawn therefrom in the light most favorable to Plaintiff.  See Thompson
17   v. Davis, 295 F.3d 890, 895 (9th Cir. 2002).  According to the Complaint, Plaintiff is a Hispanic
18   prisoner in the custody of the California Department of Corrections and Rehabilitation ("CDCR").
19   Compl. at 2.  He was transferred to Calipatria State Prison in April 2002.  Id. at 3.  Plaintiff
20   alleges that two events at Calipatria led prison officials to retaliate against the prison's Hispanic
21   inmates.  Id. at 3-4.  He describes the first as simply an "incident" involving Hispanic inmates and
22   prison staff on August 18, 2005.[4]  Id. at 3.  He describes the second as an assault on a staff
23   member on March 20, 2006.  Id. at 4.  Plaintiff alleges that a white inmate perpetrated the March
24   assault, but prison officials "falsely blamed" it on Hispanics.  Id.

25        On April 29, 2006, officers with the Investigative Services Unit ("ISU") took Plaintiff
26   outside the housing unit for questioning by the Special Security Unit ("SSU").  Id.  During the

27   _____

28        [3] Defendants do not assert an exhaustion defense for Defendants Bishop, Crabtree, or Duarte.
         [4] Plaintiff, in an administrative appeal, referred to this incident as a "riot," although he does not use that word
     in the Complaint.  Compl. Ex. T, at 3.

interview, an unnamed SSU officer allegedly told Plaintiff that Defendant Scribner, the warden at Calipatria, "requested to have all 'DRB'[5] inactive gang status Hispanic inmates removed from the general population—because of the staff assaults." Id. At the time of this interview, Plaintiff was classified as an inactive associate of a prison gang. Id. at 5. Plaintiff told the officers that he had no problems with prison staff and had, in fact, received six laudatory reports. Id. Nonetheless, Plaintiff was placed in administrative segregation on May 2, 2006. Id. at 6. The prison's stated justification for removing Plaintiff from the general population was "possible prison gang activity on behalf of the Mexican Mafia Prison Gang." Id.

On May 31, 2006, Plaintiff received three reports detailing what prison officials described as evidence of his gang association. Id. at 6. The reports, authored by Defendant Bishop, a correctional officer in the Gang Intelligence Operations Unit, state that the following items were discovered in Plaintiff's cell: (1) two birthday cards containing a symbol used to express loyalty to the Mexican Mafia; (2) a drawing by a well known member of the Mexican Mafia; and (3) a coded address book. Compl. Ex. H. Plaintiff alleges that Defendant Bishop's reports "contained false, manipulated and/or omitted facts/statements . . . of where the material was actually located and whom [sic] owned some of the material." Id. at 6. Specifically, Plaintiff asserts that: (1) he did not draw the alleged gang symbol inside the birthday card given to him and he was unaware of its meaning; (2) the other birthday card and the drawing by the gang member belonged to another prisoner; and (3) he coded the address book to protect family and friends in case of loss, theft, or misplacement, not to hide gang activity. Id. at 6-9.

On June 2, 2006, two officers, including Defendant Crabtree, a sergeant with the ISU, approached Plaintiff in the yard for a pre-validation interview. Id. at 9. Plaintiff alleges that he had prepared a written statement regarding the material being used against him, but Defendant Crabtree refused to get it from Plaintiff's cell or let Plaintiff retrieve it himself. Id. at 9-10. When Plaintiff asked Defendant Crabtree about the alleged gang symbol in the card, the officer allegedly told him that it was "a 'wobbler' as a prison gang symbol—but that it was being used against Plaintiff in that fashion anyway." Id. at 10. Plaintiff alleges that Defendant Crabtree then

---

[5] Plaintiff uses "DRB" as an acronym for "Director's Review Board." Compl. at 3.

walked away, refusing to take his statement.  Id.

At some point in July 2006, Plaintiff received a report authored by Defendant Duarte, a gang investigator with the ISU.  Id. at 10-11, Ex. I.  The report summarized the prison's investigation into Plaintiff's gang status and indicated that the prison would be requesting that the Office of Correctional Safety revalidate Plaintiff as a gang associate of the Mexican Mafia. Compl. Ex. I.  Among other things, Defendant Duarte claimed that Plaintiff possessed a mail drop address utilized by an active gang member.  Id.  Defendant Duarte also claimed that he contacted Plaintiff for a pre-validation interview, but Plaintiff refused to be interviewed.  Id.  On July 27, 2006, the Office of Correctional Safety revalidated Plaintiff as an associate of the Mexican Mafia prison gang.  Compl. at 10.

Plaintiff alleges that he was "targeted" for removal from the general population, not because of misbehavior, but because of his race and status as an inactive gang associate.  Id. at 5.  He describes his removal as retaliation for his filing of an administrative grievance "concerning/complaining of the unjust lockdown treatment toward Hispanic inmates."  Id.  On July 31, 2006, Plaintiff filed an administrative grievance (CDCR Appeal 602 Log # CAL-S-06-02475) that accused Defendant Duarte of writing his report with "malice intent and wreakless [sic] disregard for the truth."  Compl. Ex. P, at 1.  Plaintiff stated that his address book contained no prison gang addresses and that Defendant Duarte never came to speak with him—Defendant Crabtree did.  Id. at 3.  Defendant Stratton, the initial reviewer,[6] denied Plaintiff's appeal on December 26, 2006.  Compl. at 12, Ex. P, at 1-2, 4.  Plaintiff pursued his grievance through the prison system's final level of review, the Director's Level, where it was denied on April 16, 2007. Compl. Ex. P, at 2,7.

Plaintiff filed another grievance on Sept. 28, 2006 (CDCR Appeal Log # CAL-S-06-02650) challenging the "untrue" allegations that led to his revalidation as a gang associate and his "discriminatory" transfer to administrative segregation.  Compl. Ex. O, at 1, 3.  Plaintiff specifically accused Defendant Scribner of targeting him for removal from the general population

---

[6] Plaintiff's grievance bypassed the Informal, Formal, and First Levels of Review.  Compl. Ex. P, at 1-2. Defendant Stratton interviewed Plaintiff regarding his appeal at the Second Level of Review.  Id. at 2.

despite Plaintiff's "positive program" and lack of "prison gang activities." Id. at 1.  Plaintiff pursued this appeal to the final level of review, where it was denied on April 16, 2007.  Compl. Ex. O, at 11.

Plaintiff filed a "group appeal" (no log number assigned) on Feb. 27, 2007, alleging that Defendants Scribner and Stratton employed discriminatory policies in removing prisoners from the general population based on their race, origin, inactive gang status, and "innocent association with members of [their] racial group."  Compl. Ex. K, at 1.  The prison variously screened out his appeal at the First Level as incomplete, untimely, and duplicative.  Id. at 6, 7, 9.  When Plaintiff appealed directly to the Director's Level, the documents were returned to him with no decision rendered on the grounds that the form was not completed through the Second Level of Review because it was "rejected, withdrawn or cancelled."  Id. at 4.

In March 2007, Plaintiff became aware of another staff report concerning his 2006 gang investigation.  Compl. at 14.  Plaintiff alleges that this report, authored by Defendant Tamayo, "contained the same false and manipulated, omitted information as [Defendant] Duarte's [report]."  Id.  Plaintiff filed an administrative appeal regarding Defendant Tamayo's report on March 8, 2007 (CDCR Appeal 602 Log # CAL-S-07-00540).  Compl. Ex. Q, at 1.  The prison screened out the appeal as untimely, presumably because months had passed since Defendant Tamayo authored the report.  Id. at 6.  Plaintiff re-filed the appeal, appending an explanation that he filed the grievance the same day he learned about the document.  Id. at 7.  On April 25, 2007, and again on May 2, 2007, the prison screened out Plaintiff's appeal as duplicative of his appeal against Defendant Duarte.  Id. at 8,10.  When Plaintiff appealed directly to the Director's Level, the documents were returned to him on the basis that the appeal was untimely.  Id. at 4.

## DISCUSSION

### I. Failure to Exhaust Administrative Remedies

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C.A. § 1997e(a).  This limitation "allows prison

officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." Jones v. Bock, 549 U.S. 199, 204 (2007).  Exhaustion of administrative remedies is a mandatory step, even if the specific relief sought—money damages, for example—is unavailable through the prison's administrative channels.  See Booth v. Churner, 532 U.S. 731, 733 (2001).  Proper exhaustion occurs when prisoners "'complete the administrative review process in accordance with the applicable procedural rules' . . . that are defined not by the PLRA, but by the prison grievance process itself." Jones, 549 U.S. at 218 (quoting Woodford v. Ngo, 548 U.S. 81, 88 (2006)).

According to California's administrative appeals system, which is outlined in Title 15 of the California Code of Regulations, prison inmates can appeal "any departmental decision, action, condition, or policy which they can demonstrate as having an adverse effect upon their welfare." Cal. Code Regs. tit. 15, § 3084.1(a).  The initial appeal must be filed within 15 working days of the event that prompted the complaint.  Cal. Code Regs. tit. 15, § 3084.6(c).  A prison can screen out late grievances as untimely.  Cal. Code Regs. tit. 15, § 3084.3(c)(6).  Typically, prisoners must subject their complaints to one informal and three formal levels of review to properly exhaust their remedies.  Cal. Code Regs. tit. 15, § 3084.5.  In short, "a grievant must use all steps the prison holds out, enabling the prison to reach the merits of the issue." Griffin v. Arpaio, 557 F.3d 1117, 1119 (9th Cir. 2009).

A motion to dismiss for non-exhaustion is properly brought as a non-enumerated motion under Federal Rule of Civil Procedure 12(b). Wyatt v. Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003).  In deciding a motion to dismiss for non-exhaustion, a court "may look beyond the pleadings and decide disputed issues of fact." Id. at 1119-20.  Because non-exhaustion is an affirmative defense, "inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones, 549 U.S. at 216.  If a defendant can show that a prisoner failed to exhaust available administrative remedies, the court should dismiss the claim without prejudice. Wyatt, 315 F.3d at 1120.

///

///

### A. Defendant Scribner

Defendants note that Plaintiff learned about Defendant Scribner's "targeting" of Hispanic inactive gang associates during the SSU interview on April 29, 2006. Defs.' Mem. at 17. Defendants therefore argue that, pursuant to California regulations, Plaintiff should have filed a grievance within 15 days. Id. at 18. Instead, Plaintiff waited until he appealed his gang validation on Sept. 28, 2006 (CAL-S-06-02650), to mention the warden's alleged misconduct. Id. Defendants argue that this was too late to incorporate the warden's acts, particularly because the gang investigation was an issue "completely separate and apart" from the warden's alleged "targeting." Id.

Plaintiff disputes that the "targeting" and gang validation were distinct problems requiring separate appeals. Opp'n at 5. He argues, in essence, that the former caused the latter. Id. In addition, Plaintiff asserts that Defendants are foreclosed from raising a timeliness issue at this stage because the prison reviewed CAL-S-06-02650 on the merits, rather than screening it out as untimely. Id. at 7.

The Ninth Circuit has explained that the main purpose of an inmate grievance "is to alert the prison to a problem and facilitate its resolution, not to lay the groundwork for litigation." Griffin, 557 F.3d at 1120. Accordingly, a grievance is not *per se* inadequate simply because it fails to name every party who is later sued, Jones, 549 U.S. at 219, and it need not specify legal theories or list every fact necessary to prove each element of a legal claim, Griffin, 557 F.3d at 1120 ("[W]hen a prison's grievance procedures are silent or incomplete as to factual specificity, a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought."). California's 602 appeals form requires only that an inmate "describe the problem and action requested." Cal. Code Regs. tit. 15, § 3084.2(a).

Plaintiff correctly asserts that he pursued his September grievance, CAL-S-06-02650, to the Director's Level, the final level of review. Opp'n at 4; Compl. Ex. O, at 2. In the denial letter, the chief of CDCR's Inmate Appeals Branch summarized Plaintiff's contentions as follows:

> It is the appellant's position that there are several factors disproportionately in consistent [sic] with the imposition of his gang validation and indeterminate Security Housing Unit (SHU) term. He alleges that on April 29, 2006, the Calipatria State Prison (CAL) Warden and Special Services Unit (SSU) had him targeted for

removal of [sic] the general inmate population due to his Departmental Review Board inactive status.  He claims that this was done in reaction to the August 18, 2005, incident between Hispanic inmates and staff.  He states that on May 2, 2006, he was placed into the Administrative Segregation Unit (ASU) for possible involvement of [sic] the Mexican Mafia.  He contends that this was a clear discriminatory action, which is a result of a flawed investigation and the allegations are untrue.

Compl. Ex. O, at 11.  The denial letter also stated that "[a]ll submitted documentation and supporting arguments of the parties have been considered."  Id.  From this letter, it is clear that the decision-maker at the final level of review knew that the prisoner was challenging Defendant Scribner's practice of "targeting" inactive gang members, including Plaintiff, and that he rejected that argument.  The claim is exhausted.

As for the timeliness issue, Defendants' argument rests largely on Woodford v. Ngo, 548 U.S. 81 (2006).  In Woodford, the Supreme Court rejected a prisoner's argument that he had exhausted his administrative remedies because the prison would not hear his untimely grievance. Id. at 86-87.  The Court held that the PLRA required "proper," not just technical, exhaustion. Id. at 83-84.  Prisoners, in other words, cannot exhaust their administrative remedies by filing late or otherwise defective grievances.  Id.

The instant case differs from Woodford.  Rather than screen out Plaintiff's grievance as untimely, the prison accepted it and evaluated it on the merits.  Compl. Ex. O, at 2, 6, 11.  As Plaintiff correctly argues, the Seventh Circuit has held that "when a state treats a filing as timely and resolves it on the merits, the federal judiciary will not second-guess that action, for the grievance has served its function of alerting the state and inviting corrective action."  Riccardo v. Rausch, 375 F.3d 521, 524 (7th Cir. 2004); see Opp'n at 7.  Although the Ninth Circuit does not appear to have made such an explicit statement, the Supreme Court has stressed that a primary goal of the PLRA is "to eliminate unwarranted federal-court interference with the administration of prisons," Woodford, 548 U.S. at 93, and the PLRA therefore seeks to "affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  Porter v. Nussle, 534 U.S. 516, 525 (2002).  The Ninth Circuit has

8

relied heavily upon the purposes served by the PLRA[7] in evaluating whether prisoners have properly exhausted their administrative remedies.  See Nunez v. Duncan, 591 F.3d 1217, 1226 (9th Cir. 2010) ("Allowing an excuse for failure to exhaust under the circumstances of this case furthers the PLRA's goal of efficiency . . . ."); see also Jones v. Stewart, 457 F. Supp. 2d 1131, 1136-37 (D. Nev. 2006) (holding that if, at every level of administrative review available, prison officials review the merits of a grievance that does not meet the applicable procedural rules, such as timeliness, the prisoner has satisfied the administrative exhaustion requirement of Woodford v. Ngo).

Defendants correctly assert that Plaintiff filed grievance CAL-S-06-02650 more than 15 days after he heard about the warden's alleged directive.  Nevertheless, prison officials reviewed the grievance in its entirety, including the allegations against Defendant Scribner, and decided it on the merits.  As a result, Defendants have not shown that Plaintiff failed to exhaust his administrative remedies against Defendant Scribner.  The Court therefore **RECOMMENDS** that Defendants' Motion to Dismiss Plaintiff's claims against Defendant Scribner for failure to exhaust be **DENIED**.

### B. Defendant Stratton

Plaintiff alleges that Defendant Stratton failed to investigate grievance CAL-S-06-02475 against Defendant Duarte.  Compl. at 12-14.  The record before the Court shows that Plaintiff pursued CAL-S-06-02475 through the Director's Level.  Id. Ex. P, at 7.  Defendants argue, however, that Plaintiff should have filed a separate grievance concerning Defendant Stratton's misconduct to properly exhaust his administrative remedies.  Defs.' Mem. at 19.

---

[7]  In Woodford, the Supreme Court explained that exhaustion of administrative remedies serves two important purposes:

> First, exhaustion protects administrative agency authority.  Exhaustion gives an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures.  Second, exhaustion promotes efficiency.  Claims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court.  In some cases, claims are settled at the administrative level, and in others, the proceedings before the agency convince the losing party not to pursue the matter in federal court.

548 U.S. at 89 (internal citations and quotation marks omitted).

Plaintiff asserts that the actions of the two defendants were so intertwined that the same grievance should suffice. Opp'n at 10-11. Plaintiff notes that after Defendant Stratton rejected his appeal against Defendant Duarte, Plaintiff appended Defendant Stratton's name to the grievance and forwarded the entire package to the Director's Level. Id. at 9-11. Plaintiff argues that any failure to exhaust should be excused because his actions conformed with a reasonable interpretation of California's grievance form, which states that a prisoner dissatisfied with a lower level review should explain his reasons as part of his submission to the next level. Id. at 8-10. Plaintiff cites Giano v. Goord, 380 F.3d 670, 676 (2d. Cir. 2004), for the proposition that there are "special circumstances" in which a prisoner's failure to comply with administrative procedural requirements may be justified. See id. at 10. The Second Circuit held in Giano that a prisoner's reasonable interpretation of prison regulations justified his failure to exhaust when he raised allegations of retaliation by appealing his disciplinary conviction instead of filing a separate grievance. 380 F.3d at 679.

Even though Giano is not binding authority, the Ninth Circuit cited it with approval in Brown v. Valoff, 422 F.3d 926, 937 (9th Cir. 2005) (assessing whether prisoners exhausted administrative remedies that were available to them). Moreover, the Ninth Circuit recently indicated its willingness to recognize some exceptions to the PLRA's exhaustion requirement. See Nunez, 591 F.3d at 1224 (holding that a prisoner's failure to timely exhaust his administrative remedies was excused where he took "reasonable and appropriate steps to exhaust," but was precluded by a warden's mistake.)

Plaintiff concedes that he did not file a separate grievance for Defendant Stratton's alleged misconduct. Opp'n at 12. The question, therefore, is whether Plaintiff's tacking of Defendant Stratton's name onto his grievance against Defendant Duarte was a reasonable interpretation of California's prison regulations. Here, Defendant Stratton's alleged misconduct was part of the Duarte appeal because the only allegation against Defendant Stratton was that he did not adequately investigate the Duarte appeal. Comp. at 12-14; Compl. Ex. P, at 6. Because the 602 form states, "If dissatisfied, add data or reasons for requesting a Director's Level Review . . ." (Compl. Ex. P, at 2. ), it was reasonable for Plaintiff to believe that he could add Defendant

Stratton's alleged misconduct during the appeal process to the existing appeal.   Moreover, Defendants have not provided any case law indicating that such a process was improper.   See Defs.' Mem. at 19.

In the Director's Level letter denying Plaintiff's July appeal, CAL-S-06-02475, prison officials noted: "The appellant has added new issues and requests to his appeal.  The additional requested action is not addressed herein as it is not appropriate to expand the appeal beyond the initial problem and the initially requested action."  Compl. Ex. P, at 7.  Although this language could indicate that Plaintiff improperly included Defendant Stratton in his appeal, the phrase "new issues and requests" is too ambiguous to make such a determination in this case.   In his final appeal, Plaintiff added Defendant Stratton but he also added a new section under "Note," asserting that the appeal was "incorrectly processed" and requesting that the appeal "be re-filed under the CDC 1858 Complaint Appeal Procedures."  Compl. Ex. P, at 6.  As such, it is not clear whether the language in the Director's Level decision about "new issues and requests" referred to  Plaintiff's re-filing request or his addition of Defendant Stratton and therefore the decision language did not adequately notify Plaintiff that the prison did not consider the Duarte/Stratton matter exhausted.   See Brown, 422 F.3d at 937 ("[I]nformation provided [to] the prisoner is pertinent because it informs our determination of whether relief was, as a practical matter, 'available.'").[8]   Because the burden is on Defendants to prove exhaustion, the Court **RECOMMENDS** that Defendants' Motion to Dismiss Plaintiff's claims against Defendant Stratton for failure to exhaust be **DENIED**.

### C. Defendant Tamayo

Defendants argue that even though Plaintiff filed a grievance on March 8, 2007 concerning Defendant Tamayo's allegedly flawed report (CAL-S-07-00540), the prison screened it out, so

---

[8] Notably, a prisoner need not identify or name each defendant in an administrative grievance form to properly exhaust his claim.  Jones, 549 U.S. at 219; see also Lewis v. Mitchell, 416 F. Supp. 2d 935, 941-42 (S.D. Cal. 2005); Irvin v. Zamora, 161 F. Supp. 2d 1125, 1134-35 (S.D. Cal. 2001) ("Under the facts presented, there is nothing to indicate that officials would have done anything differently if plaintiff pursued more specific claims against the individuals responsible . . . .").  Here, Defendant Duarte's report triggered Plaintiff's grievance and Defendant Stratton's alleged inaction simply compounded the problem.  As such, Plaintiff's grievance was "sufficient under the circumstances to put the prison on notice of the potential claims and to fulfill the basic purposes of the exhaustion requirement."  Irvin, 161 F. Supp. 2d at 1135.

Case 3:09-cv-02507-AJB-BLM   Document 35   Filed 11/10/10   PageID.301   Page 12 of 28

Plaintiff failed to exhaust.  Defs.' Mem. at 11.  Plaintiff responds that because the prison screened the Tamayo grievance out for being "duplicative" of the grievance filed against Defendant Duarte and Plaintiff fully exhausted the Duarte appeal, the claim against Defendant Tamayo also was fully exhausted.  Opp'n at 18-19.  In other words, if the grievance against Defendant Tamayo raised the same issue as the exhausted Duarte appeal, then the Tamayo grievance also was exhausted.  Id.

The appeals coordinator initially returned Plaintiff's grievance against Defendant Tamayo because there had been "too great a TIME LAPSE" since the event being appealed.  Compl. Ex. Q, at 6.  Plaintiff re-filed the grievance, explaining that he had just learned about Defendant Tamayo's report and arguing that grievance therefore was timely.  Id. at 6-7.  In response, the appeals coordinator again returned the grievance, explaining that the grievance duplicates Plaintiff's July grievance against Defendant Duarte, CAL-S-06-02475, which accused Defendant Duarte of intentionally authoring an inaccurate report.  Compl. Ex. Q, at 8; Ex. P, at 1.  Plaintiff re-submitted the Tamayo grievance, explaining the differences between the Tamayo grievance and the Duarte grievance (Comp. Ex. Q, at 9), but it was again rejected as duplicative (id. at 10).  The final decision included the warning that "[t]his is your final screening notice do not resubmit or the original will be retained by the appeal staff."  Id. at 10.

The prison's repeated refusal to consider Plaintiff's grievance against Tamayo on the grounds that it duplicated Plaintiff's grievance against Duarte, even after the differences were explained, defeats Defendants' failure to exhaust argument.  By characterizing the new grievance as duplicative, prison officials implicitly acknowledged that they were on notice of the problem—inaccurate gang reports—and incorporated the previous, fully-exhausted denial.  Defendants cite no authority to support their argument that a denial on the grounds that the new grievance duplicates a fully-exhausted grievance does not fully exhaust the grievance, especially given the facts in this case.  Because the burden is on the Defendants to show non-exhaustion, the Court **RECOMMENDS** that Defendants' Motion to Dismiss Plaintiff's claims against Defendant Tamayo be **DENIED**.

///

09cv2507-BEN (BLM)

**II. Failure to State a Claim**

To state a viable claim under § 1983, a plaintiff must allege that (1) a person acting under the color of state law committed the conduct at issue, and (2) the conduct violated a right provided by the Constitution or laws of the United States.  See, e.g., West v. Atkins, 487 U.S. 42, 48 (1988).  A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). To survive such a motion, a plaintiff must set forth "enough facts to state a claim to relief that is plausible on its face."  Id. at 570.  Naked assertions "devoid of further factual enhancement" are insufficient.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citation and internal quotation marks omitted); see also Moss v. United States Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009). In evaluating a claim, the court should use judicial experience and common sense as its guide. Iqbal, 129 S. Ct. at 1950.

At this stage of the litigation, a court must accept as true all factual allegations in the complaint, Erickson v. Pardus, 551 U.S. 89, 93-94 (2007), but it "need not accept as true conclusory allegations, nor make unwarranted deductions or unreasonable inferences," In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1057 (9th Cir. 2008) (citation omitted).  In cases where the plaintiff is proceeding without counsel, and particularly in civil rights cases, a court should construe the pleadings liberally.  Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005); Ferdik v. Bonzelet, 963 F.2d 1258, 1261 (9th Cir. 1992).  The court should consider attachments to the complaint as part of the complaint.  See United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).

**A. First Amendment – Retaliation**

Plaintiff's first claim is that Defendants retaliated against him in violation of his First Amendment rights.  Compl. at 16-19.  A viable claim of First Amendment retaliation within the prison context entails five basic elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68

(9th Cir. 2005) (footnote and citations omitted).  With respect to the third element, the Ninth Circuit has held that prisoners have a First Amendment right to file grievances.  Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003).  With respect to the fourth element, the Ninth Circuit has determined that an allegation of "harm that is more than minimal" suffices.  Rhodes, 408 F.3d at 567 n.11.

Construed broadly, Plaintiff's complaint alleges that correctional officers, at Defendant Scribner's command, took an adverse action against him, namely harassment via false accusations.  Compl. at 17-18.  Plaintiff alleges that the motivation for Defendant Scribner's order was, at least in part, Plaintiff's grievance filing, which is a form of protected conduct.  Id. at 18.  Plaintiff also alleges he suffered more than minimal harm, namely adverse conditions of confinement and a lost chance at parole.  Id.  Taken together, those allegations satisfy elements one through four.

Defendants contend that the fifth element is lacking.  Defs.' Mem. at 20.  They argue "there is no doubt that quelling violence in the prison and routing-out suspected prison gang associates serve a legitimate penological purpose of ensuring the safety and security of the institution."  Id. at 21.  They argue that Plaintiff, rather than asserting facts, makes only the conclusory assertion that Defendants' actions did not advance a penological goal.  Id.

Based on the record before the Court, however, Plaintiff does put forward some facts that counter Defendants' argument.  Compl. at 17-19.  For example, Plaintiff asserts that he was "not involved in any of the staff assaults and in fact was a model inmate, positive programmer, and had been disciplinary [sic] free for close to (10) ten years."  Id. at 19.  Plaintiff also asserts that there was "[no] information to suggest [he] was involved in 'gang activity.'"  Id.  Given the required "liberal" reading at this stage of the proceedings, Plaintiff's complaint states facts asserting that Defendants acted arbitrarily.  In Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985), the Ninth Circuit held that an allegation of "arbitrary and capricious" action by prison officials satisfied the fifth element of a retaliation claim.  See also Austin v. Terhune, 367 F.3d 1167, 1170 (9th Cir. 2004); Hines v. Gomez, 108 F.3d 265, 269 (9th Cir. 1997); Pratt v. Rowland,

1   65 F.3d 802, 807 (9th Cir. 1995).   Accordingly, the Court **RECOMMENDS** that Defendants'

2   Motion to Dismiss Plaintiff's retaliation claim be **DENIED**.

3   ### B. First Amendment – Freedom of Association

4   Plaintiff submits that Defendants Bishop, Crabtree, Stratton, Duarte, and Tamayo infringed

5   on his First Amendment associational rights by "falsely, maliciously charging [him] with the

6   'symbol' that was drawn by other inmates." Compl. at 29.   Plaintiff contends his interaction with

7   other prisoners was entirely innocent, and he alleges that the prison has a custom of punishing

8   inmates for innocent exchanges with members of their own race, such as "a simple hello[,]

9   borrowing a book or recieving [sic] or giving a gift." Id. at 30-31.

10   Within certain limits, a prison may abridge a prisoner's constitutional rights to serve the

11   needs of the institution. See Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119,

12   125-26 (1977); Bull v. City and Cnty. of San Francisco, 595 F.3d 964, 972 (9th Cir. 2010) (en

13   banc); see also Pell v. Procunier, 417 U.S. 817, 822 (1974) ("A prison inmate retains those First

14   Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate

15   penological objectives of the corrections system."). In Jones, for example, the Supreme Court

16   held that prison officials could bar inmates' union meetings because the associational rights

17   under the First Amendment "must give way to the reasonable considerations of penal

18   management." 433 U.S. at 121, 132. However, such limitations must still rationally relate to a

19   legitimate penological interest. See Overton v. Bazzeta, 539 U.S. 126, 132 (2003); Turner v.

20   Safley, 482 U.S. 78, 91 (1987) (concluding that a regulation barring inmate-to-inmate

21   correspondence was reasonably related to legitimate security interests).

22   Defendants argue that gang membership and association is a threat to prison security.

23   Defs.' Mem. at 22. They claim that the complaint and attached exhibits show that the symbol

24   in the birthday card is one used to show loyalty to the Mexican Mafia prison gang. Id. They

25   argue that restrictions on gang members' ability to associate clearly advances a legitimate

26   penological goal. Id.

27   Plaintiff claims his activities have been mischaracterized. Compl. at 29-30. He alleges that

28   it was unnecessary to validate *him* based on "innocent" association. Id. Plaintiff alleges that

1  he did not know the meaning of the symbol or the gang affiliations of those with whom he

2  associated.  Id. at 30.  He claims that "Defendants can not, could not show how Plaintiff

3  receiving a birthday card—that had those symbols in it—threatens the safety of the institution

4  or advances any penological interest . . . ."  Id.

5  Because prison gangs represent unique dangers, courts are loath to find that inmate gang

6  validation regulations do not bear a reasonable relation to a valid penological interest.  See, e.g.,

7  Stewart v. Alameida, 418 F. Supp. 2d 1154, 1161 (N.D. Cal. 2006);  Ruiz v. Cate, No. 09-2968,

8  2010 WL 546707, at *4 (N.D. Cal. Feb. 10, 2010) ("The use of the artwork with a validated gang

9  member's name on it for purposes of determining whether [plaintiff] was inactive in the gang

10  did not violate his First Amendment rights.").  For example, in Alameida, when an inmate claimed

11  that the prison's policy of validating an individual as a gang associate solely on the basis of

12  "simple association" with other validated gang associates violated his right to freely associate

13  with others, the court concluded that "there is a valid, rational connection between institutional

14  security and regulations designed to isolate threats before their potential is realized."  418 F.

15  Supp. 2d at 1163.  The court further explained that "[t]his nexus is not destroyed by the

16  possibility that inferences might sometimes be a necessary substitute for direct evidence that

17  often will not be available until institutional security has already been compromised."  Id.  The

18  same analysis, reasoning, and conclusion applies to this case.  The Court therefore **RECOM-**

19  **MENDS** that Defendants' Motion to Dismiss Plaintiff's Free Association claim be **GRANTED**

20  without leave to amend.  See Ramirez, 334 F.3d at 861 (court may dismiss a claim without leave

21  to amend where the "pleading could not possibly be cured by the allegation of other facts").

22  **C. Eighth Amendment**

23  Plaintiff submits that Defendants violated his Eighth Amendment right to be free from

24  cruel and unusual punishment by wrongfully removing him from the general population.  Compl.

25  at 20.  He alleges that there is "an immense difference between General Population and solitary

26  confinement."  Id.  He also alleges that the "barrage of false accusations" caused him "mental

27  anguish."  Id.

28  ///

16                                                    09cv2507-BEN (BLM)

The Supreme Court has held that the unnecessary and wanton infliction of pain upon prisoners violates the Eighth Amendment.  Hope v. Pelzer, 536 U.S. 730, 737 (2002).  To challenge his conditions of confinement, a prisoner must satisfy a two-part test.  Hearns, 413 F.3d at 1042.  First, the plaintiff "must make an objective showing that the deprivation was 'sufficiently serious' to form the basis for an Eight Amendment violation."  Id. (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  Second, the plaintiff "must make a subjective showing that the prison official acted 'with a sufficiently culpable state of mind.'"  Id.  The Ninth Circuit has held that "[p]rison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety."  Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (citations omitted).  However, the basis of an Eighth Amendment violation is formed only when "those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave."  Id.; see also Hearns, 413 F.3d at 1042-43 (holding that a prisoner stated a viable Eighth Amendment claim by alleging that an institution failed to provide adequate drinking water in 100-plus degree heat); Akao v. Shimoda, 832 F.2d 119, 120 (9th Cir. 1987) (holding that "an allegation of overcrowding without more does not state a claim" under the Eighth Amendment, but the scale tips the other way when overcrowding "engenders violence, tension, and psychiatric problems").  Thus, simple placement in segregated housing, even for an indeterminate period, does not by itself constitute an Eighth Amendment violation. Toussaint v. Yockey, 722 F.2d 1490, 1494 n.6 (9th Cir. 1984).  However, "conditions of confinement may establish an Eighth Amendment violation 'in combination,' even when each would not do so alone, 'when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need.'"  Madrid v. Gomez, 889 F. Supp. 1146, 1265 n.209 (N.D. Cal. 1995) (quoting Wilson, 501 U.S. at 304).

Defendants argue that subjecting a prisoner to false accusations and transferring him to administrative segregation are not sufficiently grave to form the basis for an Eight Amendment violation.  Defs.' Mem. at 22.  They cite Helling v. McKinney, 509 U.S. 25, 31-33 (1993), for the proposition that a prison's duty under the Eighth Amendment is to provide humane conditions of confinement and to take reasonable measures to guarantee the safety of inmates.  Id. at 21.

Defendants argue that Plaintiff's claim cannot lie because he has not alleged deprivations of adequate food, clothing, shelter, sanitation, medical care, or personal safety, and Plaintiff therefore "fail[s] to overcome the objective element of an Eighth Amendment claim." Id. at 22. Plaintiff offers no binding or persuasive authority to support his argument that segregation is itself cruel and unusual. He also fails to allege facts akin to inadequate drinking water that would permit an inference that conditions in Administrative Segregation are actually inhumane. When Plaintiff says there is "an immense difference between General Population and solitary confinement," it is unclear what precisely that means or whether he experienced deprivations that were cruel and unusual. Compl. at 20. Moreover, the Ninth Circuit has not held that the mere filing of a false disciplinary report constitutes cruel and unusual treatment.[9] As such, the Court **RECOMMENDS** that Defendants' Motion to Dismiss Plaintiff's Eighth Amendment claim be **GRANTED** with leave to amend to add specific facts establishing cruel and unusual treatment and the requisite mental state for each defendant.

### D. Fourteenth Amendment – Due Process

Plaintiff claims that Defendants violated his constitutional due process rights when they revalidated him as a gang associate and assigned him to the SHU for an indeterminate term. Compl. at 23. Specifically, Plaintiff alleges that Defendants (1) lacked the evidence to validate him as a gang affiliate; (2) denied him employee assistance and witnesses; and (3) failed to give him an opportunity to present his views to the officials making the decision. Id. at 23-28. Defendants, on the other hand, argue that (1) the evidence was sufficient to revalidate Plaintiff, and (2) Plaintiff received all the process that was due. Defs.' Mem. at 25-29.

The Ninth Circuit treats California's policy of assigning suspected gang affiliates to the Security Housing Unit as an administrative strategy, not a disciplinary measure. Bruce, 351 F.3d at 1287. Accordingly, such assignments are essentially a matter of "administrative discretion." Id. There are some legal limitations, however. See Toussaint v. McCarthy, 801 F.2d 1080, 1100 (9th Cir. 1986). When an inmate is administratively segregated, prison officials must: (1) "hold

---

[9] Instead, the Ninth Circuit has stated that "there are no procedural safeguards protecting a prisoner from false retaliatory actions . . . ." Hines v. Gomez, 108 F.3d 265, 268 (9th Cir. 1997).

an informal nonadversary hearing within a reasonable time after the prisoner is segregated"; (2) "inform the prisoner of the charges against the prisoner or their reasons for considering segregation"; and (3) "allow the prisoner to present his views." Id. Moreover, there has to be "some evidence" to support a gang validation. Bruce, 351 F.3d at 1287 (citing Superintendent v. Hill, 472 U.S. 445, 455 (1985) ("This standard is met if there was some evidence from which the conclusion of the administrative tribunal could be deduced . . . .") (citation and internal quotation marks omitted).[10]

### 1.  Adequacy of the Hearing

Plaintiff argues that the hearing was insufficient because he was not given assistance with his defense, was not permitted to present witnesses, and was not given an opportunity to present his views. Comp. at 23-28.  The Toussaint guidelines do not require prisons to provide prisoners with staff assistance or with an opportunity to present witnesses prior to segregation. Toussaint, 801 F.2d at 1101.  So, to the extent Plaintiff alleges being denied such opportunities constitutes a due process violation, Plaintiff fails to state a claim.  A prisoner does, however, have a right to present his views to the decision-maker.  Id.  In addition, that opportunity must be "meaningful."  See Mathews v. Eldridge, 424 U.S. 319, 333 (1976); Avina v. Medellin, 339 Fed. Appx. 739, 741 (9th Cir. 2009); Arteaga v. Alameida, No. S-03-1004, 2008 WL 364785, at *6 (E.D. Cal. Feb. 8, 2008) (finding that a dispute over the meaningfulness of a five-minute hearing precluded summary judgment for prison officials).

Plaintiff acknowledges being approached by Defendant Crabtree and another officer for a pre-validation interview.  Compl. at 9.  However, Plaintiff alleges that the officer refused Plaintiff's request to retrieve a written statement from his cell and that Defendant Crabtree simply walked away, saying, "Well I'm just gonna write that you refused to make a statement." Id. at 10.  Construing the complaint liberally, Plaintiff, like the prisoner in Arteaga, has alleged that he was denied a *meaningful* opportunity to be heard.  At this stage of the litigation, the

---

[10]A Due Process violation also requires the existence, and loss, of a liberty interest.  See Sandin v. Conner, 515 U.S. 472 (1995).  Here, Defendants do not argue that Plaintiff does not have an actionable liberty interest.  As a result, the Court does not address this issue.

1    court need not determine whether that interpretation is correct.   Plaintiff's allegations are

2    sufficient to state a viable claim.

3                        **2.    Sufficiency of the Evidence**

4           Ascertaining whether there was, in fact, "some evidence" to justify a particular action does

5    not require "examination of the entire record, independent assessment of the credibility of

6    witnesses, or weighing of the evidence." Hill, 472 U.S. at 455.  The relevant question is "whether

7    there is any evidence in the record that could support the conclusion . . . ." Id.  Even meager

8    evidence may suffice.  Id. at 457; see also Hamilton v. O'Leary, 976 F.2d 341, 345 (7th Cir.

9    1992) ("The proposition that constructive possession provides 'some evidence' of guilt when

10   contraband is found where only a few inmates have access is unproblematical.").   The Ninth

11   Circuit has held that a single piece of evidence may satisfy due process in the context of a gang

12   validation if that evidence has "sufficient indicia of reliability."   Bruce, 351 F.3d at 1288

13   (examining a sheriff's department report, a probation report, and a statement of a confidential

14   prison informant and stating that "any of these three pieces of evidence would have sufficed to

15   support the validation because each has sufficient indicia of reliability"); see also Toussaint v.

16   McCarthy, 926 F.2d 800, 803 (9th Cir. 1990) ("Uncorroborated hearsay by a confidential

17   informant is not reliable information.") (internal citation omitted).

18          Plaintiff asserts that the prison had no evidence—only "bald accusations"—to support his

19   alleged gang affiliation.  Compl. at 25.  According to the Complaint and attached exhibits, the

20   prison's investigation focused on a coded address book, a drawing by a well-known gang

21   member, and two birthday cards with alleged gang symbols.  Compl. at 6-8; Compl. Ex. H.

22   Plaintiff disputes each item's evidentiary value.  Compl. at 24.  Plaintiff asserts he formatted his

23   address book simply "to protect his family and friends," and that Defendant Bishop "never found

24   any gang member or associate addresses" in his address book.  Id.  Plaintiff also contends that

25   "[Defendant] Bishop knew full well the drawing did not belong to Plaintiff" because the true

26   owner claimed the drawing as his.  Id. at 25.  Additionally, Plaintiff asserts there was no

27   indication that he "knew of, knows, or communicates/associates with [the artist responsible for

28   the picture]" or knew that the artist was a gang member.  Id.  Regarding the alleged gang

1   symbol in his birthday card, Plaintiff argues that he "did not draw it[,] use it or know what is

2   was" and he should not be held accountable for "[t]he fact that other inmates chose to use that

3   symbol in the birthday card." Id. at 26.

4        Defendants contend the evidence was sufficient to revalidate Plaintiff, and that Plaintiff's

5   exhaustive complaint makes it possible for the Court to make such a determination at this early

6   stage. Defs.' Mem. at 26.  Pointing to Defendant Bishop's reports (Compl. Ex. H), Defendants

7   argue that coded address books are commonly used by gang affiliates, and that the drawing in

8   Plaintiff's cell was penned by a well-known gang member. Id. at 27.  Defendants also argue that

9   at least one birthday card clearly belonged to Plaintiff because individuals addressed the recipient

10  as "Dave Dude," as in David Cota, and this card contained symbols with a known connection to

11  the Mexican Mafia. Id. at 27-28.

12       Plaintiff's allegations, if true, do not suggest that the items in question did not exist, but

13  that the items lacked the necessary "indicia of reliability" to show gang affiliation.  Compl. at 23-

14  27.  Moreover, Plaintiff asserts other facts, such as Defendant Crabtree's "wobbler" comment,

15  that raise questions about the evidentiary value of the evidence.  At the pleading stage, this

16  ambiguity, in conjunction with Plaintiff's allegations that he was not given an adequate

17  opportunity to present his views, suffice to state a procedural due process claim.  The Court

18  therefore **RECOMMENDS** that Defendants' Motion to Dismiss Plaintiff's Due Process claim

19  against Defendants Bishop, Crabtree, Duarte, Stratton, and Tamayo be **DENIED**.

20            **3. *Respondeat Superior* liability**

21       Defendants argue that Plaintiff's due process claim does not reach Defendant Scribner

22  because Plaintiff fails to allege the warden was personally involved in the gang validation

23  investigation. Defs.' Mem. at 25.  Defendants further assert that a due process claim cannot lie

24  with respect to the warden because *respondeat superior* liability does not exist under § 1983.

25  Defs.' Mem. at 25.

26       The Ninth Circuit has held, however, that a supervisor may be liable if there is "a sufficient

27  causal connection between the supervisor's wrongful conduct and the constitutional violation."

28  Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989) (citation omitted).  Thus, as a supervisor,

Defendant Scribner may only be held liable for the allegedly unconstitutional violations of his subordinates if Plaintiff alleges specific facts which show that Defendant Scribner either: "personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or promulgated or 'implement[ed] a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation.'" Aparicio v. Clark, No. 1:09CV01783, 2010 WL 3718840, at *1 (E.D. Cal. Sept. 20, 2010) (quoting Hansen, 885 F.2d at 646; Taylor, 880 F.2d 1045) (internal quotation marks omitted).

Plaintiff does not allege that Defendant Scribner, as warden, was responsible for the wrongdoing of his subordinates merely because of his supervisory position. Cf. Aparicio, 2010 WL 3718840, at *2. Rather, Plaintiff's allegation is that Defendant Scribner issued an order to the other defendants to do whatever is necessary, including making false or unsupported allegations, to remove Plaintiff from the general population. Compl. at 18. Because, liberally construed, Plaintiff's Complaint alleges that Defendant Scribner's order was the "moving force" behind the alleged constitutional violations, Plaintiff's allegations are sufficient at this stage of the litigation to support a claim against Defendant Scribner. The Court therefore **RECOM-MENDS** that Defendants' Motion to Dismiss Plaintiff's due process claim against Defendant Scribner be **DENIED**.

### E. Fourteenth Amendment – Equal Protection

Plaintiff claims that Defendants violated his constitutional right to equal protection by targeting him for removal from the general population "based on his race." Compl. at 21. He alleges that prison officials admitted as much by telling him that "they were ordered by [Defendant] Scribner to remove all 'DRB' 'inactive' Hispanic inmates from General Population" following the white inmate's assault on staff. Id. at 22.

Defendants argue Plaintiff's allegations fail to support the claim. Defs.' Mem. at 23-24. Defendants note that Plaintiff does not allege Defendants Stratton, Crabtree, Duarte, Tamayo, or Bishop personally removed Plaintiff from the general population. Id. Defendants also highlight that Plaintiff's transfer occurred on May 2, 2006, before any of the actions attributed

to Defendants Stratton, Crabtree, Duarte, Tamayo, or Bishop occurred.  Id. at 24.  Defendants further argue that Plaintiff does not allege that he was targeted for removal from the general population based solely upon his race.  Id. at 24-25.  They note that Plaintiff acknowledges the warden's directive came in the wake of prison violence and that only Hispanic inmates formerly associated with prison gangs were targeted.  Id.  Defendants thus argue that Plaintiff concedes he was removed on the basis of possible prison gang activity.  Id.

The Equal Protection Clause of the Fourteenth Amendment protects prisoners from, among other things, "invidious discrimination based on race."  See Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  The clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  The Ninth Circuit has held that "§ 1983 claims based on Equal Protection violations must plead intentional unlawful discrimination or allege facts that are at least susceptible of an inference of discriminatory intent."  Byrd v. Maricopa Cnty. Sheriff's Dep't, 565 F.3d 1205, 1212 (9th Cir. 2009) (quoting Monteiro v. Tempe Union High Sch. Dist., 158 F.3d 1022, 1026 (9th Cir. 1998); see also Serrano v. Francis, 345 F.3d 1071, 1081-82 (9th Cir. 2003) (holding that a prison officer's racially tinged remarks to an inmate during a disciplinary hearing created a genuine issue of material fact about the officer's potentially discriminatory motives).  Discriminatory intent implies that the decision-maker "selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of' its adverse effects upon an identifiable group."  Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979) (footnote omitted).

Although Plaintiff repeatedly asserts that he was discriminated against because of his race, the pleading principles underlying the Supreme Court's Twombly and Iqbal decisions demand more specificity.  In Iqbal, for example, the Court rejected as conclusory a Muslim man's assertion that government officials subjected him to harsh conditions "solely on account of [discriminatory factors] and for no legitimate penological interest."  129 S. Ct. at 1951.  Stripping the man's complaint to its factual allegations—that the FBI arrested thousands of Arab Muslim men in the wake of the September 11 terrorist attacks—the Court reasoned that the man had

not plausibly suggested that the government purposefully discriminated on prohibited grounds. Id. at 1951-52.

The warden's alleged crackdown at the prison is similar to those post-September 11 arrests. Like the government in Iqbal, the warden acted in a manner that could have a disparate impact on a particular group in the aftermath of a violent incident. Just as the Iqbal arrests did not, by themselves, plausibly suggest discrimination on prohibited grounds, Plaintiff's allegation that the warden ordered all Hispanic inactive gang associates removed from the general population in the wake of a staff assault is insufficient, without more, to support an Equal Protection claim.

Plaintiff does, however, allege an additional fact that is susceptible to an inference of discriminatory intent: He contends that "another raced inmate"—not a Hispanic in-mate—committed the assault that prompted the warden's crackdown. Compl. at 22. Attached to Plaintiff's Complaint is a statement from the alleged assailant who claims that prison officials, including the warden, tried to coerce him to implicate Mexicans. Id. Ex. A. This allegation is sufficient at this stage of the litigation to push Plaintiff's Equal Protection claim against the warden across Iqbal's plausibility line, but it does not link the remaining Defendants to the alleged coercion. Without that connection, nothing plausibly suggests the remaining Defendants discriminated against Plaintiff on prohibited grounds. As a result, the Court **RECOMMENDS** that Defendants' Motion to Dismiss Plaintiff's Equal Protection claim be **DENIED** with respect to Defendant Scribner but that it be **GRANTED with leave to amend** with respect to the remaining Defendants.

## F. Conspiracy

Plaintiff's final claim is that Defendants conspired to interfere with his constitutional rights in violation of 42 U.S.C. §§ 1983 and 1985. Compl. at 31-32. Specifically, Plaintiff claims that Defendant Scribner authored a plan to target him for removal from the general population, while the other Defendants followed Scirbner's orders by making false allegations and "by supporting one another[']s false information." Id. at 31. Plaintiff asserts that Defendants' actions were "based on racial animus [] because Scribner was angry at the Hispanic inmate population[,] as

were the other [D]efendants[,] because of the staff [H]ispanic inmate incident [] and staff assault[,] which they tried to coerce the white inmate to blame on [H]ispanic inmates." Id.

Having already argued that Plaintiff failed to adequately allege any viable constitutional claims, Defendants contend that there is no foundation for a conspiracy claim. Defs' Mem. at 30. In addition, they argue that Plaintiff's § 1985 claim cannot withstand a motion to dismiss because Plaintiff failed to adequately allege that Defendants conspired against him because of his race. Id. at 31.

To state a viable conspiracy claim pursuant to § 1983, a plaintiff must "state specific facts to support the existence of the claimed conspiracy." Burns v. Cnty. of King, 883 F.2d 819, 821 (9th Cir. 1989) (citation omitted). The Ninth Circuit has held that "each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." Franklin v. Fox, 312 F.3d 423, 441 (9th Cir. 2002) (quoting United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1541 (9th Cir. 1989) (citation omitted)). Plaintiff must therefore show "an agreement or 'meeting of the minds' to violate constitutional rights." Id. However, "[s]uch an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." Mendocino Envtl. Ctr. v. Mendocino Cnty., 192 F.3d 1283, 1301 (9th Cir. 1999) (citation omitted). Accordingly, "a showing that the alleged conspirators have committed acts that are unlikely to have been undertaken without an agreement" may indicate the existence of a conspiracy. Id. (citation and internal quotation marks omitted).

Section 1985 prohibits conspiracies motivated by racial discrimination. See Sever v. Alaska Pulp Corp., 978 F.2d 1529, 1536 (9th Cir. 1992). To survive a motion to dismiss, a plaintiff must allege:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

United Broth. of Carpenters and Joiners of America, Local 610, AFL-CIO v. Scott, 463 U.S. 825, 828-29 (1983). As with a § 1983 claim, a pleading under this section must include "specific facts

1    to support the existence of the claimed conspiracy." Olsen v. Idaho Bd. of Med., 363 F.3d 916,

2    929-30 (9th Cir. 2004) (holding that a physician's assistant failed to state a viable conspiracy

3    claim because her complaint was "devoid of any discussion of an agreement amongst the

4    appellees to violate her constitutional rights").

5        Plaintiff alleges that the warden "gave orders that targeted Plaintiff," the other Defendants

6    followed those orders, and each Defendant's actions "individually and in concert were done in

7    furtherance of the object: to cause Plaintiff to be re-validated . . . ." Compl. at 31-32. At the

8    pleading stage, Plaintiff's Complaint sufficiently alleges a possible meeting of the minds between

9    Defendants to violate Plaintiff's civil rights because he details each individual Defendant's

10   participation in the chain of events from the warden's order to the gang validation and resulting

11   harms.[11] See Mendocino, 192 F.3d at 1301; cf. Cox v. Ashcroft, 603 F. Supp. 2d 1261, 1272

12   (E.D. Cal. 2009) ("[Plaintiff] fails to set forth the essential facts as to the specific acts of each []

13   Defendant that allegedly carried the conspiracy into effect, how those acts fit into the conspiracy,

14   and how the injury to the plaintiff was foreseeable therefrom.") (citation and internal quotation

15   marks omitted). Therefore, the Court **RECOMMENDS** that Defendants' Motion to Dismiss

16   Plaintiff's conspiracy claim be **DENIED**.

17   ///

18

---

19   [11] At the outset of his conspiracy argument, Plaintiff "realleges and incorporates by reference" all previous
     paragraphs in his Complaint. Compl. at 31. A review of the Complaint shows that Plaintiff identifies specific acts for
20   each Defendant sufficient to establish a conspiracy claim because each Defendant arguably acted in furtherance of
     the common objective of revalidating Plaintiff as a gang associate. Plaintiff first alleges that Defendant Scribner
21   "requested to have all 'DRB' inactive gang status Hispanic inmates [] removed from the general population," and to
     this end, prison officials were "to find 'something' in order to re-validate the inmates." Id. at 4-5. After Plaintiff was
22   placed in Administrative Segregation for possible prison gang activity, Defendant Bishop authored a "false" and
     "manipulated" report that "punished/punishes Plaintiff for others' actions," and Defendant Crabtree "refused to take
23   Plaintiff's statement/views on the material" in Defendant Bishop's report. Id. at 6, 9, 10. Subsequently, Defendant
     Duarte authored a gang status update report—which Plaintiff alleges is replete with "false allegations" and
24   "manipulated statements"—and Plaintiff was therefore "re-validated as an associate of the Mexican Mafia prison gang
     based on the false, unreliable and insufficient material." Id. at 10-12. Plaintiff filed a grievance regarding Defendant
25   Duarte's "false" report and "explicitly informed" Defendant Stratton as to why certain allegations in Defendant Duarte's
     report were "totally false." Id. at 12. However, Defendant Stratton told Plaintiff that "the warden wanted all DRB
26   inactive gang status [H]ispanic inmates off the yard" and "it did not matter" that Plaintiff had been disciplinary free
     for close to ten years. Id. at 13. Defendant Stratton denied Plaintiff's appeal and "did not address the issue regarding
27   [Defendant] Duarte's false report . . . ." Id. at 14. Finally, Defendant Tamayo authored a gang status update report,
     which Plaintiff alleges "contained the same false and manipulated [] information as Duarte's . . . ." Id. Thus, "[a]s
28   a result of the CAL prison officials['] unlawful actions, Plaintiff has been validated and now sits in a Security Housing
     Unit on an indefinite term." Id. at 15.

### SUMMARY OF RECOMMENDATIONS

To summarize the foregoing, the Court recommends that:

- Defendants' Motion to Dismiss Plaintiff's claims against Defendants Scribner, Stratton, and Tamayo for failure to exhaust be **DENIED**;

- Defendants' Motion to Dismiss Plaintiff's First Amendment retaliation claim be **DENIED**;

- Defendants' Motion to Dismiss Plaintiff's First Amendment freedom of association claim be **GRANTED WITHOUT LEAVE TO AMEND**;

- Defendants' Motion to Dismiss Plaintiff's Eight Amendment claim be **GRANTED WITH LEAVE TO AMEND**;

- Defendants' Motion to Dismiss Plaintiff's Fourteenth Amendment due process claim be **DENIED**;

- Defendants' Motion to Dismiss Plaintiff's Fourteenth Amendment equal protection claim against Defendant Scribner be **DENIED**;

- Defendants' Motion to Dismiss Plaintiff's Fourteenth Amendment equal protection claim against Defendants Bishop, Crabtree, Duarte, Stratton, and Tamayo be **GRANTED WITH LEAVE TO AMEND**; and

- Defendants' Motion to Dismiss Plaintiff's conspiracy claim be **DENIED**;

### CONCLUSION

For all the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) **GRANTING IN PART AND DENYING IN PART** Defendants' Motion to Dismiss.

**IT IS HEREBY ORDERED** that any written objections to this Report must be filed with the Court and served on all parties **no later than December 1, 2010**. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the Objections shall be filed with the Court and served on all parties **no later than December 22, 2010**. The parties are advised that

failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  <u>See</u> <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998).

DATED:  November 10, 2010

BARBARA L. MAJOR
United States Magistrate Judge

09cv2507-BEN (BLM)